**In re GILLETT HOLDINGS, INC., Employer Tax I.D. 51–0291762, Debtor.**

**Bankruptcy No. 91–12465–SBB.**

United States Bankruptcy Court, D. Colorado.

Aug. 23, 1991.

Douglas M. Tisdale, L. Louise Romero–Atwood, Brownstein, Hyatt, Farber & Madden, Denver, Colo., Lewis Rosenbloom, Winston & Strawn, Chicago, Ill., for debtor.

Craig Christensen, Sherman and Howard, Denver, Colo., for George Gillett.

Bernard Shapiro, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for Unsecured Creditors' Committee.

Virginia Grogan, Latham & Watkins, Los Angeles, Cal., for Smith Barney, Harris Upham & Co.

JoAnne Spiers, Denver, Colo., for U.S. Trustee's Office.

Bryan Krakauer, Sidney & Austin, Chicago, Ill., for First Nat. Bank of Chicago.

Bruce H. Spector, Stutman, Treister & Glatt, Los Angeles, Cal., for Apollo Inv. Fund & Altus Finance.

Stephen W. Seifert, Fairfield & Woods, Denver, Colo., for First Trust.

James Burghardt, Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colo., for Unsecured Creditors' Committee.

Edwin G. Perlmutter, Frances Cetrulo, Berenbaum & Weinshienk, Denver, Colo., for Executive Life.

### MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court upon the "Application of Debtor for Au-

thority to Employ Smith Barney, Harris Upham & Co. Inc." ("Smith Barney Application") and the "Application of Debtor for Authority to Employ Donaldson, Lufkin & Jenrette Securities Corporation" ("DLJ Application"), both filed June 21, 1991, and objections to the two applications filed by the United States Trustee on July 22, 1991, Norwest Bank Minnesota, N.A. on July 23, 1991, and Equitable[1] on July 23, 1991. (Smith Barney and DLJ collectively referred to as "Investment Bankers" or "Investment Banking Firms.")[2]

The central issue before the Court is: On what terms and conditions may the Debtor–in–Possession employ the Investment Banking Firms pursuant to 11 U.S.C. § 327? Gillett Holdings, Inc., the Debtor–in–Possession ("Debtor"), and the Investment Bankers argue that their employment and fee agreements are standard for and customary in the industry and the Court must approve employment on those terms. Certain creditors and the U.S. Trustee object to various terms of those agreements.

The Court concludes that the Debtor may not employ the Investment Bankers under the terms and conditions proffered despite assertions that the terms and conditions are "customary" in the investment banking business and in other similar Chapter 11 cases.[3] This is an issue of first impression in this District. The Court, having reviewed the file, the record, and being advised in the premises, issues the following findings of fact, conclusions of law, and order.[4]

### I. *Background.*

This case was commenced on February 27, 1991 by the filing of an involuntary Petition for relief pursuant to Chapter 11 of the Bankruptcy Code. Following time extensions, the Debtor[5] consented to the entry of an Order for Relief on June 25, 1991 and has continued as a Debtor–in–Possession since that time.

The Debtor requests that the Court approve the employment of Smith Barney and DLJ to act as Investment Bankers and financial advisors pursuant to certain employment and fee letter agreements ("Employment Agreements"). Under the terms of the Employment Agreement as set forth in the Smith Barney Supplemental Application, Smith Barney would receive $200,000 for work done in May and June, 1991, $150,000 per month for each month beginning July 5, 1991, $1,000,000 upon the Debtor's receipt of an agreement in principle with the holders of its various securities, and $3,000,000, as a "success fee," upon the confirmation of a Plan of Reorganization under Chapter 11.[6] Total fees for Smith Barney would not exceed $5,000,000 unless the Debtor, with Court approval, retains Smith Barney to render further as-of-yet unspecified professional services. Smith Barney would also be entitled to

---

1. EQJ Partnership and the Equitable Life Assurance Society of the United States are collectively referred to as "Equitable."

2. Additional pleadings filed and considered include: "Supplemental Application of Debtor for Authority to Employ Smith Barney, Harris Upham & Co. Inc." ("Smith Barney Supplemental Application") and "Memorandum of Law" in support thereof filed July 19, 1991, "Statement of Donaldson, Lufkin & Jenrette Securities Corporation in Support of Application for Retention" filed July 23, 1991, and responses to both applications filed by the "Bank Group" on June 26, 1991. The "Bank Group" consists of the following institutions: First National Bank of Chicago, First National Bank of Boston, Manufacturers Hanover Trust Co., Wells Fargo Bank, N.A., The Toronto Dominion Bank, Continental Bank, N.A., NCNB Texas National Bank, and First Wisconsin National Bank of Milwaukee.

3. Smith Barney and DLJ are presently working for the Debtor under an interim Order entered June 27, 1991 and extended August 12, 1991, pending submission and approval of employment agreements whose terms comply with the guidelines set forth herein.

4. A hearing was held on July 29, 1991, at which time this Court denied from the bench both of the applications without prejudice and reserved the right to issue this formal written opinion.

5. The Debtor is a multi-level holding company with over 50 subsidiaries, primarily in the resort, meatpacking, and media industries.

6. At the Court's urging, the Smith Barney Supplemental Application amended the original Smith Barney Application by removing the condition that the $3,000,000 would also be earned even in a conversion to and liquidation under Chapter 7.

reimbursement for all of its reasonable and necessary out-of-pocket expenses, including fees and disbursements of Smith Barney's own attorneys.[7] The Smith Barney Employment Agreement also proposes, in part, that the Debtor will indemnify Smith Barney against losses, claims, damages, liabilities, and expenses except those which might arise out of Smith Barney's own "willful misconduct, gross negligence or malfeasance." Appendix A to Employment Agreement between Debtor and Smith Barney dated May 17, 1991.[8]

With respect to DLJ, the Debtor proposes to pay a cash fee of $100,000 for the period of February 15, 1991 through May 15, 1991, and a monthly fee of $25,000 thereafter. The Debtor desires to pay DLJ $1,000,000 upon consummation of the Debtor's proposed exchange offers, subject to certain enumerated offsets. Similarly, under the DLJ Employment Agreement, DLJ would be entitled to reimbursement for all of its reasonable and necessary out-of-pocket expenses, including payment of DLJ's attorney's fees[9] and expenses. DLJ would, as well, be indemnified by the Debtor against losses, claims, damages, liabilities and expenses except those which might arise out of its own "willful misconduct, gross negligence or malfeasance." DLJ Employment Agreement dated June 10, 1991, p. 3.

## II. *Discussion.*

This Court will address several major areas of concern with the Investment Bankers' Employment Agreements and the two subject applications. The proper starting point for this process, however, is to recognize that "[t]he burden of proof to establish that proposed terms and conditions of employment are reasonable is on the moving party. The Court must be persuaded that the terms and conditions are in the interest of the estate." *In re C & P Auto Transport, Inc.*, 94 B.R. 682, 686 (Bankr.E.D.Cal.1988). *Accord, In re Chas. A. Stevens & Co.*, 109 B.R. 853, 854 (Bankr. N.D.Ill.1990). In the within case, this Court is not so persuaded.

■ A. *Reporting Standards and Monthly Fees.* Smith Barney and DLJ *do not propose* to (1) render their professional services in exchange for an hourly fee but for the bargained-for fee of $175,000 per month, and (2) apply for their fees, as do other professionals, with detailed, descriptive, legally sufficient time records and fee applications. This compensation arrangement, it is argued, is entirely consistent with the standards and procedures of the investment banking industry and other similar Chapter 11 cases.[10] They argue this fee arrangement comports with statutory compensation criteria and procedures, and the fees to be paid are equal to the cost of comparable services. 11 U.S.C. § 330. *See, Matter of Aminex Corp.*, 15 B.R. 356, 361 (Bankr.S.D.N.Y.1981) (Act case) ("Although we view time spent as a major criterion in our determination, we do not agree with the learned District Judge from Pennsylvania that such factor is to be assigned the paramount role in our fee deter-

---

**7.** Estimated by the Debtor to be $30,000 for the period June 11, 1991 to July 31, 1991 and "no more than $7,500 per month" thereafter.

**8.** Smith Barney suggests that it is willing to provide a reciprocal indemnification provision which provides that Smith Barney will indemnify the Debtor against all losses, claims, damages, liabilities, and expenses arising out of or based upon any untrue or alleged untrue statement of a material fact or any omission or alleged omission to state a material fact in certain documents; provided, however, that the aggregate amount of the indemnification shall not exceed the amount of the fees actually received by Smith Barney.

**9.** The DLJ Application contains this express provision even though counsel for the Debtor stated at the July 29, 1991 hearing that DLJ will not seek reimbursement of its attorney fees. DLJ Application, p. 3, ¶ 8.

**10.** Smith Barney cites the following cases in support of its argument: *In re Frontier Airlines, Inc.*, 74 B.R. 973, 974 (Bankr.D.Colo.1987) (allowed counsel to be paid on monthly basis with subsequent application for court approval of fees); *In re Kaiser Steel Corp.*, 74 B.R. 885, 892 (Bankr.D.Colo.1987) (same); *In re Knudsen*, 84 B.R. 668, 671 (9th Cir.BAP 1988) (agrees with *Frontier Airlines* and *Kaiser Steel* in controlled liquidation cases); *In re Shelly's, Inc.*, 91 B.R. 803, 807 (Bankr.S.D.Ohio 1988) (same, in *dicta*).

minations.... We view time spent in tandem with the results achieved....").

Smith Barney and DLJ argue that their services, unlike the services of attorneys or accountants, are not susceptible to valuation on the basis of the number of hours spent and assure this Court that neither the hours worked nor the tasks performed each month will be *de minimis*. Investment bankers do not customarily keep detailed records of the time spent and the tasks performed by each individual each day. The Investment Bankers, joined by the Debtor, believe that the investment banking profession should not be burdened by extraordinary recordkeeping, and should not be required to file detailed fee applications in form and with substance as are routinely required of all other professionals employed by a debtor-in-possession. They argue that investment bankers, if required to do so, will be driven out of the bankruptcy business.[11] *See, generally, In re Nucorp Energy, Inc.*, 764 F.2d 655, 658 (9th Cir.1985).

Although due deference should be given to the standards applicable to certain professions outside of the bankruptcy context—and professionals are entitled to compensation in bankruptcy cases comparable to that earned in non-bankruptcy cases—this Court is not bound absolutely to those standards. Rather, it is bound, first, by the dictates of the Bankruptcy Code. *See,* the recent compensation guidelines promulgated by the Southern District of New York; *In re NBI, Inc.*, 129 B.R. 212 (Bankr.D.Colo.1991) ("Reasonableness ... is typically evaluated in relation to the time, nature, extent, and value of services rendered, and, *within appropriate limits,* to the cost of comparable services outside the bankruptcy context.") (emphasis add-

ed). *Accord, In re Century Foods, Inc.*, 39 B.R. 602, 605 (Bankr.M.D.Pa.1984) (the amount of compensation that a professional person would receive in private employment is a point of reference, but not a controlling determinant of what should be allowed as compensation to such a person in a bankruptcy case). The overwhelming tendency toward allowing special treatment for investment bankers and perhaps other selected professionals that has customarily been prevalent heretofore, must give way to new notions of fairness, bankruptcy equity, and recognition of changed economic circumstances of the 1990's.

With respect to the Code requisite of professionals filing legally sufficient fee applications, the Court is not at all persuaded that investment bankers are entitled to separate, and special treatment. If, indeed, a particular profession desires extraordinary treatment, this Court must be persuaded that it is justly deserved. *Compare, Matter of Federated Dep't Stores, Inc.*, 114 B.R. 501, 506 (Bankr.S.D.Ohio 1990) ("proposed ... record keeping plan ... is reasonable and [the investment bankers] need not follow the plan applicable to attorneys and other professionals"); with *In re Hillsborough Holdings Corp.*, 125 B.R. 837, 840 (Bankr.M.D.Fla.1991) ("This Court is unable to find any authority supporting the proposition that investment advisors are not subject to the mandate of Bankruptcy Rule 2016(a).... While this Rule may not please the community of investment advisors, this Court is constrained to conclude that the Bankruptcy Code and Rules are controlling, not the general policy or custom of the investment advisors which prevails in the operation of the business of investment bankers or advisors.");[12] and *Matter of Baldwin–Unit-*

---

**11.** One court dealt with this argument as follows:

> Dean Witter may decide that it does not want to do bankruptcy work. If it does want to do bankruptcy work, it must live with the terms of employment as authorized by the court in which the case is pending. Furthermore, Dean Witter may not withdraw without Court approval, which could be denied at this point in the case.

*In re Mortgage & Realty Trust,* 123 B.R. 626, 631 (Bankr.C.D.Cal.1991).

**12.** The *Hillsborough Holdings* court further observed,

> This Court is not unaware that the world of investment banking is indeed a strange but wonderful place where a large amount of money is spent, generally at the expense of debtors in Chapter 11. Nevertheless, this Court is satisfied that in the absence of time

*ed Corp.,* 79 B.R. 321, 351 (Bankr.S.D.Ohio 1987) ("While its private clients may be satisfied with this arrangement, it fails to comply with this Court's fee guidelines and applicable caselaw [sic].").

This Court is persuaded that Smith Barney and DLJ must file legally sufficient applications for fees in the same manner and subject to the same basic statutory requirements as other professionals. As a general rule, investment bankers must be treated as other Section 327 professionals and should not be given extraordinary treatment, absent a compelling reason to do so.[13] *See generally, Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *Matter of Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981).

Smith Barney and DLJ have already been paid some $1,400,000 for their contributions to the draft Plan of Reorganization prior to the submission of the instant applications to employ. The monthly fees allowed by the Employment Agreements total $175,000, a not insubstantial sum, and they are not, under the current suggested arrangements, subject to any real creditor review, accountability, or limitations. This Court does not here find that flat monthly payments are never permissible, or *per se* invalid, only that such payments have not been justified in this case. *Accord, In re Mortgage & Realty Trust,* 123 B.R. 626, 633 (Bankr.C.D.Cal.1991). *See, generally, In re Public Service Co. of New Hampshire,* 88 B.R. 518 (Bankr.D.N.H.1988) (summarily allowed); *Baldwin–United, supra* at 351 (same); *In re Knudsen Corp.,* 67 B.R. 254, 255 (Bankr.C.D.Cal.1986) (same); *In re White Motor Credit Corp.,* 50 B.R. 885, 901 (Bankr.N.D.Ohio 1985) (same). *But see, e.g., NBI, supra* (court

denied approval of "earned upon receipt" retainer in bankruptcy case, an analogous situation).

*In summation, the Investment Bankers will be held to the same basic practice and standards of other professionals if they wish to be employed in this case; this includes filing informative, legally sufficient fee applications which allow for scrutiny and accountability as to the services rendered and fees requested. It also includes application of the "reasonable compensation" standard to fees paid.* 11 U.S.C. § 330(a)(1).

■ B. *Indemnification.* This Court has grave concerns regarding the gross negligence carve-out from the Debtor's broad indemnification obligations under the Employment Agreements with each of the Investment Bankers. Smith Barney and DLJ argue that the broad protections granted them by the Employment Agreements are customary in their industry. Characterizing the provisions as small concessions in exchange for their services, they maintain that the terms were agreed to by the Debtor in good faith, after armslength negotiations, and that "it would be unfair, after the negotiation, to require [an investment banker] to abandon this customary—but critical part of its agreement." Smith Barney Supplemental Application, p. 7 and Memorandum of Law in support thereof, p. 7.

Smith Barney adds that this Court should approve the terms of the indemnification agreement because it has previously been retained in several major Chapter 11 cases pursuant to indemnification arrangements which were substantially identical to the one at issue.[14] Smith Barney was un-

---

record, it is almost impossible to determine the reasonable value of the services rendered. *In re Hillsborough Holdings Corp.,* 125 B.R. 837, 840 (Bankr.M.D.Fla.1991).

**13.** Certain concessions in these reporting standards may be necessary to account for the time of some individuals in the investment banking firms. Alternative means of accounting for such "hidden resources" as trading floor personnel need, perhaps, to be developed.

**14.** Smith Barney refers this Court to unreported decisions in the following bankruptcies: East-

ern Air Lines, Inc. (Lifland, J.; S.D.N.Y.); Continental Airlines, Inc. (Balick, J.; D.Del.); Greyhound Lines, Inc. (Schmidt, J.; S.D.Tex.); Siliconix Incorporated (King, J.; N.D.Cal.). This Court adopts the following response: "The Court is not persuaded by this type of authority. Unreported bankruptcy court decisions have very little weight as precedent. When a bankruptcy judge wants a decision to serve as precedent, the judge publishes the decision. Unpub-

successful, however, in persuading at least one other court as to the reasonableness of this argument. *In re Allegheny Int'l Inc.*, 100 B.R. 244 (Bankr.W.D.Pa.1989).[15] Initially, the *Allegheny* court found that, despite the arguments of the investment bankers to the contrary, "Section 328(a) empowers a debtor in possession or official committee to employ professionals on any reasonable terms and conditions of employment, *subject to court approval.*" *Id.*, at 246 (emphasis in original). Upon review of the terms of the proposed indemnity provisions, the court found:

> Although we will allow some form of indemnification to continue, the present indemnification provisions are too broad ... [and] [w]e think the exemption from indemnification for gross negligence is much too narrow.... Smith Barney expect[s] to receive handsome compensation for their services. At those rates of compensation, *we do not think that it is unreasonable for their services to be presented with a high standard of professionalism.* Indemnification and professionalism are not entirely consistent.

*Id.*, at 246 (emphasis added).

The Debtor as a debtor-in-possession is a fiduciary. *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct 1986, 1994, 85 L.Ed.2d 372 (1985). Investment bankers and financial advisors hired by the Debtor are also fiduciaries. *Accord, Allegheny, supra* at 246.

> As such, they 'have obligations of fidelity, undivided loyalty and impartial service in the interest of the creditors they represent' ... indemnification for negligence may be acceptable in 'the workaday world for those acting at arm's length.' However, holding a fiduciary harmless for its own negligence is shockingly inconsistent with the strict standard of conduct for fiduciaries.... The present indemnification language also proscribes indemnification for acts of willful misconduct. Although willful misconduct may also encompass a breach of fiduciary duty, we now hold that the debtor may not indemnify Smith Barney ... for acts or omissions, which are found by this bankruptcy court or other court of competent jurisdiction, to be a breach of a fiduciary duty.

*Id.*, at 246–247 (quoting *In re Mesta Machine Co.*, 67 B.R. 151, 156 (Bankr.W.D.Pa. 1986) and *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928)).

Smith Barney and DLJ are, effectively, asking this Court to shield them, as agents and fiduciaries of the Debtor, from their own errors and omissions, their own negligence. That is entirely improper and unacceptable to this Court. They are entitled to no more, and no less, protection than that afforded to other professionals employed by the Debtor. The estate and creditors are, likewise, entitled to no less.

This Court agrees with the analysis of the court in *Allegheny*. Smith Barney and DLJ, as fiduciaries, may not absolve themselves of such a broad range of potential liability or responsibility for their own actions which might constitute negligence or misfeasance.[16] This Court will not go so far as to hold that indemnity provisions *per se* are either unacceptable or unnecessary in these circumstances. *See, Mortgage & Realty Trust, supra* at 631–632. Indemnity provisions must be analyzed on a case-

---

lished decisions do not establish case law and do not serve as precedent." *Mortgage & Realty Trust, supra* at 630.

**15.** While Smith Barney cited various Chapter 11 cases in which this type of indemnification was allowed, they failed to cite *In re Allegheny Int'l, Inc.*, 100 B.R. 244 (Bankr.W.D.Pa.1989) to this Court; a case in which Smith Barney was a party and the judge issued a written opinion rejecting Smith Barney's position.

**16.** Both of the indemnity provisions at issue except from their scope acts amounting to negligence and "misfeasance." Black's Law Dictionary describes misfeasance as "[t]he improper performance of some act which a man may lawfully do. 'Nonfeasance' means the omission of an act which a person ought to do; 'misfeasance' is the improper doing of an act which a person might lawfully do; and 'malfeasance' is the doing of an act which a person ought not to do at all." Black's Law Dictionary 902 (5th ed. 1979). The inclusion of this term by the Investment Bankers does not remove the instant applications from the scope of the cogent analysis by the *Allegheny* court.

by-case basis and, as such, the terms of the indemnity provisions presently before this Court are simply unacceptable.[17]

■ C. *"Success Fees."* For purposes of this Opinion, this Court will refer to the $5,000,000[18] payable to the Investment Bankers upon the occurrence of specified contingencies as "success fees."[19] Similar compensation has been awarded to professionals based on criteria such as exceptional performance, extraordinary or unexpected benefit conferred on creditors of the estate, unusually effective and successful nature of Chapter 11 proceedings, and time frame within such successful results are accomplished.[20] *Compare, In re Summit Communities of Florida, Inc.,* 84 B.R. 863, 867 (Bankr.S.D.Fla.1988) with *Baldwin–United Corp., supra* at 351.

While such an award may indeed become justified based upon the results of this Chapter 11 case, it is impossible for this Court to determine whether a success fee is earned until the services are performed and are found to qualify under the Bankruptcy Code. *See,* 11 U.S.C. § 330(a)(1) (such compensation must be based upon "the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a [bankruptcy] case."). This Court does not consider it at all inappropriate or improper for a professional to ask for a success fee or bonus in an appropriate case, or for a court to award such a fee based upon a showing that it has been earned. The Court also recognizes the propriety and value of contingency fee arrangements. However, such a determination of a bonus and award of millions of dollars of fees, as a bonus, in tandem with a fixed monthly fee, embodied in a Court Order is improper at the onset of a case; it must await a successful conclusion of the services and a proper showing of entitlement. *Accord, Mortgage & Realty Trust, supra* at 632.

The inclusion of an automatic success fee as a *fixed, definite, unqualified, contracted-for right* upon the occurrence of specified future events—coupled with a proposed fixed, definite, unqualified, contracted-for monthly fee of $175,000—is unacceptable. At the suggestion of the Court, the parties have indicated that they may subsequently decide to include the success fee in the Employment Agreements as an "anticipated" fee, or agreed "target" fee, and provide that it will be requested in the event that certain conditions precedent occur. As long as the determination of final and actual entitlement awaits a proper evaluation by creditors and consideration by the Court, this would be entirely acceptable.[21] It may be true that, given the time

---

**17.** Although Smith Barney has proposed to offer a reciprocal indemnity arrangement, the concession does not go far enough. In addition to the shortcomings cited above, this Court cannot ignore that Smith Barney also intends to limit their liability to a disgorgement of fees previously received. *See, In re Glosser Bros. Inc.,* 102 B.R. 38, 42 (Bankr.W.D.Pa.1989).

**18.** The sum of $1,000,000 to Smith Barney upon the receipt of an agreement in principle with security holders, $3,000,000 to Smith Barney upon the confirmation of a Plan, and $1,000,000 to DLJ upon consummation of the proposed exchange offers.

**19.** Other appropriate synonyms might include: "premium," "reward," "bonus," or "enhancement." *See, Matter of Aminex Corp.,* 15 B.R. 356, 362 n. 33 (Bankr.S.D.N.Y.1981) (an Act case).

**20.** Smith Barney argues that the success fee is actually more akin to a "contingency fee" than a bonus because the goal is known. Whatever label is put upon the anticipated compensation, this Court's analysis remains the same.

**21.** The existence of the significant success fees is illustrative of a pervasive problem with the Employment Agreements as negotiated. The standards of reasonableness and excessiveness are not only quantitative, but qualitative in nature. The Bankruptcy Code provisions "protect against the danger that a prospective debtor, willing to do whatever necessary to secure the counsel of its choice, may bargain away more than is reasonable ... unknowingly or otherwise. [Citation omitted.] The complexity of a prospective debtor's financial affairs and the business sophistication incident thereto may well render such a debtor *more vulnerable not less,* to making concessions deemed essential to obtain[ing] counsel sufficiently qualified to manage and complete a successful reorganization." *In re NBI, Inc.,* 129 B.R. 212 (Bankr. D.Colo.1991) (emphasis added). Moreover, "[f]reedom of contract is necessarily limited in the bankruptcy context ... debtors are not at

saved by utilizing the Investment Bankers' skills, the entire request, including success fees, is reasonable. The Court will deal with the issue at the appropriate time.[22] Today it is speculative and premature.

■ D. *Attorneys' Fees of Investment Bankers to be Paid by Debtor.* Smith Barney and DLJ have required that *their own attorneys' fees and expenses be paid by the Debtor on a monthly basis* as an expense of their own investment banking and financial consulting services supplied to the Debtor. This too, it is argued, is standard procedure in the investment banking world and customary in other similar Chapter 11 cases.

This Court disagrees with the practice, as structured, and concludes that the Investment Bankers' attorneys must (1) be disinterested, (2) not hold or represent interests adverse to the estate, and (3) apply for and seek approval of all such fees and expenses just as will all other professionals requesting compensation from and being paid by this Debtor's estate. This Court cannot and will not summarily, and without any justification or accountability whatsoever, approve Debtor's payment of the attorneys' fees incurred by the Investment Bankers as a cost of estate administration. *See, In re Land,* 116 B.R. 798, 803–804 (D.Colo.1990).

Neither the Bankruptcy Code nor the Rules provide specific procedures or practices for payment of fees, or employment of professionals who are themselves employed by a debtor's professionals. Under the circumstances in this case, however, the Debtor is paying, albeit indirectly, the fees of their professionals' professionals. The Court will, thus, adopt and implement procedures and practices for payment of these fees which are parallel to and serve the same purposes of those set forth in the Code.

The Court thus concludes that (1) employment of the Investment Bankers' attorneys who are to be paid by the Debtor as a cost of administration must be subject to the Code standards of "disinterestedness" and absence of conflicts of interest, and (2) fees of the attorneys hired by the Debtor's Investment Bankers, which are to be paid by the Debtor as a cost of administration, will be subject to the standards and scrutiny governing payment of professionals' fees and costs of administration provided for in the Bankruptcy Code and Bankruptcy Rules. *See,* 11 U.S.C. §§ 328, 330, 331 and 503(b); B.R. 2016.

■ E. *Possible Duplication of Efforts.* The Debtor maintains that the *two* Investment Banking Firms are necessary; they will be dealing with distinct, yet concededly intertwined, types of corporate debt. Even though one firm might be able to competently deal with the situation in its entirety, the Debtor feels that its genuinely complex financial structure and convoluted inter-company debt situation justifies its desire to use the best available resource for a timely reorganization—and that means using two firms. Moreover, the Debtor argues that the two Investment Banking Firms, working as a "team," [23] have invested substantial lead time, are each intimately familiar with the particular type of debt

liberty to bargain away the rights and responsibilities of a debtor-in-possession, nor the protections afforded creditors and other parties in interest in a bankruptcy case, under the guise of freedom of contract. They cannot evade the jurisdiction of the Court by choice, nor limit exercise of the Court's discretion by fiat. They cannot negate or defer application of the Bankruptcy Code and Rules by design." *Id. Accord, In re Chas. A. Stevens & Co.,* 109 B.R. 853, 854 (Bankr.N.D.Ill.1990); *Glosser Bros., supra* at 42.

22. The Court is not persuaded by the Debtor's and Investment Bankers' argument that Section 328(a) allows the Court the option to reduce the contracted-for "success fees," at the conclusion

of the case and this assures a "reasonable fee." Careful examination of the language in Section 328(a) reveals, at least arguably, a *qualified and limited Court option to reduce fees at the conclusion of the case,* i.e., fees may be reduced if "such terms prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions."

23. Interestingly, the Debtor formerly utilized the services of numerous investment banking firms, presumably all performing necessary services to the Debtor, and has now decided that these two Investment Banking Firms form a sufficient "team" for its present needs.

with which they plan to work, and, if one firm is forced to take upon itself the entire burden, a prompt and hopefully successful reorganization will necessarily be delayed by the imposition of a "learning curve." Finally, the Debtor states that the total anticipated compensation to *both* Investment Banking Firms performing their respective distinct tasks is comparable to that which would be legitimately earned by *one* firm doing all the work.

This Court, after initial hearing, has yet to be persuaded that the services of both Investment Banking Firms are now necessary. Furthermore, this Court is not persuaded that many of the tasks to be performed by Smith Barney and DLJ, as described, are not more properly the duty of the Debtor's attorneys. *See, generally, In re Glosser Bros. Inc.*, 102 B.R. 38, 41 (Bankr.W.D.Pa.1989). Absent the Debtor demonstrating an actual need and benefit to hiring both Investment Banking Firms and a scheme for elimination of, or limitations on, duplication of work, the Court will not employ both firms.

### III. *Conclusion.*

For investment bankers and certain other professionals, the line between reasonable and acceptable employment and fee agreements and unreasonable, or unacceptable, agreements is not defined or clearly drawn by the Bankruptcy Code. Case law is not much additional help.

This Court elects to be cautious in approving the Investment Bankers' engagement and fee agreements, in part, because of the precedent it sets in this case and others.

> Whenever special terms and conditions are requested [in employment agreements], it is important for the court to focus upon them because, once approved, they are difficult to unravel. Changes are permitted only if the terms and conditions originally approved 'prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.'

*C & P Auto Transport, supra* at 685 (quoting 11 U.S.C. § 328(a)). *Accord, In re Cal Farm Supply Co.*, 110 B.R. 461, 465 (Bankr.E.D.Cal.1989).

The Court concludes that under the circumstances of this case, the Debtor-in-Possession cannot employ the two Investment Banking Firms because of important deficiencies in, or unreasonable terms of, their employment and fee agreements. The Investment Bankers and Debtor are entitled to reconsideration of this matter, however, the Investment Banking Firms, must first (1) agree to comply with and be subject to standard bankruptcy fee practices and procedures, (2) modify their indemnification arrangements to comport with those putting them on a more comparable basis with other professionals employed by Debtor, (3) make alternative provisions for potential award of success, or bonus, fees, (4) make suitable arrangements for payment of their own attorneys' fees, and (5) make a more persuasive showing of the need and benefit of employing two investment banking firms.

Accordingly, it is ORDERED as follows:

1. The "Application of Debtor for Authority to Employ Smith Barney, Harris Upham & Co. Inc." filed June 21, 1991 is hereby DENIED.

2. The "Application of Debtor for Authority to Employ Donaldson, Lufkin & Jenrette Securities Corporation" filed June 21, 1991 is hereby DENIED.

3. The "Supplemental Application of Debtor for Authority to Employ Smith Barney, Harris Upham & Co. Inc." filed July 19, 1991 is hereby DENIED.