In re INTELOGIC TRACE, INC., Debtor.

Bankruptcy No. 95059753–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Oct. 15, 1995.

Daniel C. Stewart, William L. Wallander, Winstead, Sechrest & Minick, P.C., Dallas, TX, for Debtor.

Nancy Ratchford, U.S. Trustees Office.

*ORDER ON APPLICATION OF STAN-FORD SPRINGEL FOR ALLOW-ANCE OF FEES AND EXPENSES FOR THE PERIOD MARCH 16, 1995 THROUGH APRIL 5, 1995*

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the foregoing matter. Stanford Springel was retained by the estate as the Debtor's Chief Interim Vice President and Chief Operating Officer. Prior to the filing, the debtor had retained Mr. Springel as a "crisis manager" on January 4, 1995, to steer the company through a very difficult cash flow problem discovered by the Board of Directors in late December, 1994. On March 10, 1995, just four days prior to

filing, the Board of Directors and Springel negotiated a change to the agreement, promising Mr. Springel a "success fee" of $125,-000, in addition to the hourly charge of $200 agreed to in the original arrangement. The success fee was payable upon, *inter alia*, the sale of substantially all of the assets of the enterprise. The Debtor, after filing, sought to "assume" this arrangement in its Amended Application to Approve Retention of Mr. Springel.

The United States Trustee objected to the fee application filed on behalf of Mr. Springel. The UST expressed no major reservations regarding the fees attributable to Mr. Springel's activities as chief interim vice president and chief operating officer (in the amount of $24,880) or the expenses attributable to those services (in the amount of $2,358.33). The UST *does* object to the success fee, however. Expressing reservations similar to those expressed by the court at an earlier hearing, the UST contends that the "success fee" is not an "actual, necessary expense of administration," and cannot be allowed under the standards set out in section 330(a)(3)–(4), as amended in 1994. *See* 11 U.S.C. § 330(a)(3)–(4) (as amended by the Bankruptcy Reform Act of 1994), *reprinted in* NORTON BANKR.L. & PRAC.2D, BANKR.CODE (Clark, Boardman, Callaghan pamphl. ed. 1994–95).

The Debtor, on behalf of Springel, counters that the success fee is reasonable under the circumstances, considering that the fee represents no more than 1½% of the overall sales price of the estate's assets ($7,750,000 in cash, plus the assumption of $6,000,000 or more of debtor liabilities arising from contracts with customers).[1] Such fees are, according to the Debtor, normal in the non-bankruptcy context. Furthermore, but for Springel's efforts, the sale might never have been consummated at all, much less at the dollar value that was ultimately obtained. The enterprise was sold as a going concern, with enough employees still in place to permit DSI (the purchaser) to take over the business with little or no interruption, and

1. The second number is "soft" in that it represents the affirmative obligation of the purchaser to perform on prepaid contracts.

with some 200 offers of full-time employment offers extended to IT employees by DSI. Springel negotiated to fend off some $100,000 in purchase price adjustments and, by his leadership, preserved cash flow and continuity of operations. Those services, maintains the Debtor, more than justify the payment of a success fee as requested here.

### DISCUSSION

■ Our starting point is the language of the new statute. Section 330(a)(3)–(4) now provide:

> (3) In determining the amount of reasonable compensation to be awarded, the court *shall* consider the nature, the extent, and the value of such services, taking into account *all relevant factors,* including—
>
> > (A) the time spent on such services;
> >
> > (B) the rates charged for such services;
> >
> > (C) whether the services were *necessary to the administration of, or beneficial at the time at which the service was rendered* toward the completion of a case under this title;
> >
> > (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
> >
> > (E) whether the compensation is *reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.*
>
> (4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—
>
> > (i) unnecessary duplication of services; or
> >
> > (ii) services that were not—

> > > (I) reasonably likely to benefit the debtor's estate; or
> > >
> > > (II) necessary to the administration of the case. ·

11 U.S.C. § 330(a)(3)–(4) (emphasis added).

■ When we examine "success fees," some of these considerations drop away, such as the "time spent" or the "rates charged." That the services might have been beneficial or necessary is of course highly relevant, however, as is whether the compensation approximates the practice outside bankruptcy. If the services for which compensation is sought were *not* likely to benefit the estate or necessary to its administration, by the same token, the court is not permitted to award compensation.

■ The court has found no cases construing the award of success fees since the enactment of the 1994 amendments to the Bankruptcy Code. A few cases prior to those amendments have discussed such fees, however. *See In re Gillett Holdings, Inc.,* 137 B.R. 452, 459 (Bankr.D.Colo.1991); *In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 17 (Bankr.S.D.N.Y.1991); *see also In re Summit Communities of Florida, Inc.,* 84 B.R. 863, 867 (Bankr.S.D.Fla.1988); *Matter of Baldwin–United Corp.,* 79 B.R. 321, 351 (Bankr.S.D.Ohio 1987). In *Gillett,* the court refused to approve the success fee in advance, preferring to wait until the end to see if it had indeed been earned. The court did note in passing that it "[did] not consider it at all inappropriate or improper for a professional to ask for a success fee or bonus in an appropriate case, or for a court to award such a fee based upon a showing that it has been earned." *Gillett,* 137 B.R., at 459. The court refused to be bound by any contractual arrangements, and found the linking of success fees as a prerequisite to retention unacceptable. *Id.*[2] In *Drexel*

---

**2.** This court issues in footnote, as did the court in *Gillett,* the cautionary note that courts cannot be bound to honor agreements improvidently made by desperate debtors prior to filing. *Id.,* 137 B.R., at 460 n. 21; *see In re NBI, Inc.,* 129 B.R. 212 (Bankr.D.Colo.1991). As the court in *NBI* noted,

> "[The Bankruptcy Code provisions] protect against the danger that a prospective debtor, willing to do whatever necessary to secure [the

services of a given professional] of its choice, may bargain away more than is reasonable ... unknowingly or otherwise.... Freedom of contract is necessarily limited in the bankruptcy context ... debtors are not at liberty to bargain away the rights and responsibilities of a debtor-in-possession, nor the protections afforded creditors and other parties in interest in a bankruptcy case, under the guise of freedom of contract. They cannot evade the jurisdic-

*Burnham,* the bankruptcy court sought to set out guidelines for investment bankers, who often seek such success fees. Said the court: "To ensure some certainty in future retentions, we hold that end bonuses or sign-on bonuses are not per se barred by § 328. They do, however, require close scrutiny and, in appropriate circumstances, may be permissible." *Drexel Burnham,* 133 B.R., at 27.

The thrust of these cases is consistent with the closer scrutiny which the 1994 amendments obviously insist courts apply when reviewing professional compensation in bankruptcy. With success fees especially, we are constrained to apply a "hindsight" approach, not bound by whatever arrangements might have been worked out prior to retention—and especially not bound by arrangements made prior to filing. *See In re NBI, Inc.,* 129 B.R. 212, 225 (Bankr.D.Colo.1991). By the same token, we are not limited to a mechanistic "lodestar" evaluation. The "hours worked times a reasonable hourly rate" formula was constructed in the context of attorneys' fees, and offers little assistance in the context of success fees for business consultants such as Mr. Springel. *See Drexel Burnham, supra,* at 27 (crafting alternative reporting mechanism designed to be more closely attuned to the nature of the services rendered and the benefit intended to be yielded).

■ We look to determine whether, in retrospect, the services rendered were both reasonable and necessary, and whether the services in fact conferred a benefit on the estate commensurate with the success fee. We also compare the fee requested to what (and whether) the marketplace pays for such services in the nonbankruptcy context. Making this evaluation in the context of a success fee is somewhat akin to the analysis one would make in evaluating a contingent fee. Given the marketplace in which professionals such as this operate, and their *legitimate* expectation of repayment in this manner in exchange for rendering the services in question, has the "success fee" been "earned" such that it is appropriate for the estate to make the payment? In the process, we ought to remember that, in this particular context, a "success fee" is less a bonus than it is an incentive, designed to induce maximum return, on the theory that, but for the fee, the professional would not even have bothered to take on the engagement.[3] Though the original agreement made between the parties is not controlling, it is at least a relevant piece of information, especially if the evidence also suggests arms'-length bargaining, relatively equal bargaining positions, and other indicia that the agreement falls within the range that the market might generate in the absence of bankruptcy.

A success fee might be warranted over and above the "regular charge" negotiated for a given professional's services, but the higher the "regular charge," the less inclined ought a court be to authorize a success fee on top of it. This was one of the features of investment bankers' fee arrangements that seemed particularly troublesome to Judge Brooks in *Gillett.* See Gillett, supra.

■ A success fee need not necessarily be supported with hourly billing statements, but the professional must, as Judge Conrad noted in *Drexel Burnham,* sufficiently detail both what the professional intended to accomplish at the front end and whether the professional in fact reached that goal at the back end. The professional ought also be

---

tion of the Court by choice, nor limit exercise of the Court's discretion by fiat. They cannot negate or defer application of the Bankruptcy Code and Rules by design."
*NBI,* 129 B.R., at 225.

3. This is not an easy matter to parse. We have keenly in mind the concerns expressed by Judge Conrad in *Drexel Burnham* that investment bankers specializing in bankruptcy work seem to have a captive market in which they can control the price, effectively eliminating competition. If bankruptcy estates are being subjected to a

"hold-up," as Judge Conrad chafed, then only the courts can prevent abuse. By the same token, however, judges who set arbitrary guidelines risk being so far out of step with the marketplace that they skew the process, driving away competent professionals. Judges cannot make this sort of evaluation without good, candid evidence, yet the fee area is one of the most difficult arenas in which to find good candid evidence. *See Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249 (5th Cir.1986).

specific in explaining just what she did to accomplish that end.[4]

 The fee ought to bear a reasonable relationship to the ultimate benefit conferred. The court will rely in part on what kind of price the market itself places in return for yielding the benefit in question, much as the court in evaluating a real estate commission might look at what sort of commission it generally takes to generate sales of a given size and type.[5] Again, a court must be careful here. If the only "marketplace" is the marketplace of professionals who work almost exclusively in bankruptcy cases, a court might justifiably be suspicious that bankruptcy gets a "special pricing arrangement." The statute tells the court to look *outside* bankruptcy for assistance on this point, and it will be up to parties to furnish the court with the information it needs to do the task imposed by Congress. The second part of this particular element will then require the court to focus on exactly what the benefit in question really was. If, for example, part of the "benefit" is the elimination or assumption of claims that the estate would never have paid anyway (because higher priority claims will "eat up" the proceeds), then the estate gained no real benefit and should not pay a fee to that extent.

The factual presentation made on behalf of Mr. Springel's success fee was essentially uncontroverted, though it was also deficient in some respects. Success fees for investment bankers, crisis managers, and the like are not at all uncommon, according to the representations of the Debtor on behalf of Mr. Springel. In this case, the fee would yield but one to one and one-half percent of the value of the sale achieved by Mr. Springel, a percentage alleged to be far below what the industry often allows. We have little or no evidence regarding the industry standard before the court in this case, however. In the court's experience, success fees sought in other cases have not fallen within any particular percentage range, and instead seem to represent the result of negotiations among the parties, reflecting what the professional would like to demand, what the target entity can afford to pay, and what competition is available. We note in this case that (1) the debtor was *in extremis*, (2) the success fee was not actually memorialized until 4 days prior to filing (casting some doubt on the assertion that the success fee had "always been contemplated"), (3) there was no one else competing for the job, and (4) the two major creditors (especially Foothill) had a strong incentive to see the enterprise sold as a going concern. All of these factors suggest that the terms actually negotiated by the parties are of diminished assistance in evaluating whether the fee requested approximates what the market pays outside of bankruptcy for such services.

Some sort of success fee seems justified under the facts of this case, but by the time the case was filed, most of the "success" was already in place—DSI was the designated purchaser by the time of filing. True enough, the deal could have come unraveled at any point along the way, and needed to be shepherded carefully through to completion. But by the same token, the deal did not have that quality of uncertainty that one normally would expect to accompany a sizeable success fee. Such fees are designed to reward extraordinary effort, not simply to repay one for the job one was hired to do in the first place. And Mr. Springel was already receiving, per the terms of his contract, $200 per hour for his time.

We do not know whether, but for the success fee, Mr. Springel would or would not have continued to see through this engage-

---

4. The obvious point here is that the professional ought not be rewarded, at the estate's expense, for serendipity, or for results more correctly attributable to the efforts of others. This is one of the ways in which bankruptcy differs from ordinary personal injury litigation and lotteries. "Hitting the big one" ought not to be an operative concept in bankruptcy.

5. We know in the real estate context, for example, that a 5–6% fee is common in this part of the country for most real estate sales, but that a much smaller percentage might be negotiated if what is being sold is a valuable shopping center or commercial building, and that a commensurately larger commission might be required to induce the sale of small, unimproved lots.

ment to its conclusion.[6] Nor do we know who else would have been in line to do the job that he was doing. There is a quality of the debtor's being "over a barrel" that no doubt affected the ultimate fee agreed to between the parties, suggesting that no one else was available to carry this matter through to conclusion. At the same time, however, Mr. Springel is a consummate professional who values his reputation, and would have been unlikely to abandon the debtor at the last instant anyway, suggesting that he and the debtor simply attempted to "do right" by each other in order to make sure that the case was brought to conclusion with a maximum of cooperation and a minimum of hard feelings.

## CONCLUSION

Taking all of these factors into account still leaves the court with something far short of a decisional tool with the mathematical precision one might hope for. The statute speaks in generalities, entrusting a good deal of "fleshing out" to the discretion of the factfinder. We have attempted to develop some guideposts, in the hope that other courts will, with time and experience, be able to supplement this first "first cut" at the problem.

The court concludes, considering all of the foregoing, that a success fee should be allowed, in the amount of 1% of the proceeds actually realized by the estate. Those proceeds represent the substantive benefit realized by the estate.[7] The percentage represents the court's best estimate regarding an appropriate commission given the factors that surrounded the actual negotiation of a fee between the Debtor's Board of Directors and Mr. Springel, the relatively advanced state of the sale by the time the success fee was memorialized, and the fact that Mr. Springel was already being compensated at a fair (and substantial) hourly rate for per-

forming the very services that the success fee was designed to induce.

This yields a total fee of $77,500.00, which is hereby allowed. That fee allowance, in the view of the court, comports with both the standards of section 330(a)(3)–(4), as amended, and with the precautionary notes in *Gillett, Drexel Burnham,* and *NBI.*

The balance of fees requested for services at Mr. Springel's hourly rate, will be allowed as requested, in the amount of $24,880.00. In addition, his expenses, in the amount of $2,358.33, are allowed.

So **ORDERED.**

---

6. Though the court is disinclined to award fees on a "hold-up" theory, anyway. *See Drexel Burnham, supra.*

7. DSI's assumption of the Debtor's prepetition contract obligations added no real value to the estate. Had those contracts not been assumed, the nondebtor parties to those contracts would have had only unsecured claims against the bankruptcy estate, claims highly unlikely to re-

ceive any distribution anyway. DSI had a strong incentive to honor those contracts, in order to retain the future business they represented. Thus, DSI was the principle beneficiary of that feature of the sale. This is not to say that such a provision was not important to the overall sale, but only that it cannot be classified as the sort of benefit that ought to enter into the calculation of a success fee.