**In re GILLETT HOLDINGS, INC., Employer Tax I.D. 51-0291762, Debtor.**

**Bankruptcy No. 91-12465-SBB.**

United States Bankruptcy Court, D. Colorado.

Feb. 6, 1992.

See also 137 B.R. 462.

Douglas M. Tisdale, Louise Romero–Atwood, Brownstein Hyatt Farber & Madden, Lewis S. Rosenbloom, Winston & Strawn, ·Special Counsel, for debtor.

Mark Polebaum, Hale and Dorr, Mark Fulford, Sherman & Howard, Local Counsel, for Petitioning Creditors.

James Burkhardt, Moye Giles O'Keefe ·Vermeire & Gorrell, for Official Creditors' Committee.

Leslie Berg, for U.S. Trustee.

Edwin G. Perlmutter, Berenbaum & Weinshienk, P.C., for Executive Life Ins.

Virginia Grogan, Latham & Watkins, for Smith Barney, Harris Upham & Co., Inc.

**1.** Both responses were mere reservations of rights to object to the fees and expenses requested at a later date, claiming "it will be impossible to measure the value and/or reasonableness of the services rendered." Response of Official Creditors' Committee to Applications for Interim Compensation, p. 2. This Court concurs, in

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

This matter comes before the Court upon the First Quarterly Application of Smith Barney, Harris Upham & Co., Inc. ("Smith Barney") for Interim Allowance of Compensation and Reimbursement of Expenses filed October 31, 1991 ("the Application") and responses thereto [1] filed by the Official Creditors' Committee on November 26, 1991 and the United States Trustee on November 27, 1991. Following a hearing on the matter, and at the request of the Court, Smith Barney filed a Supplement to First Quarterly Application of Smith Barney, Harris Upham & Co., Inc. for Interim Allowance of Compensation and Reimbursement of Expenses on December 12, 1991 ("the Supplemental Application"). The Court, having reviewed the file and being sufficiently advised in the premises, enters the following findings of fact, conclusions of law, and order.

Briefly, this Court has reviewed both the Application and the Supplemental Application under its obligation to examine the propriety of fees and expenses. This Court concludes that the fees requested, $800,000.00, must be reduced by the amount of $501,656.75, and fees in the amount of $298,343.25 will be approved for the reasons set forth hereinbelow.

## I. BACKGROUND.

This case was commenced on February 27, 1991 by the filing of an Involuntary Petition for relief pursuant to Chapter 11 of the Bankruptcy Code. Following time extensions, the Debtor [2] consented to the entry of an Order for Relief on June 25,

part, and disagrees, in part. *See,* discussion, sections IV. and V., *infra.*

**2.** The Debtor is a multi-level holding company with over 50 subsidiaries, affiliates and related entities, primarily in the resort, meatpacking, and media industries.

1991, and has continued as a Debtor-in-Possession since that time.

Originally, employment of Smith Barney as Debtor's investment banking advisor was denied by the Court. *In re Gillett Holdings, Inc.*, 137 B.R. 452 (Bankr.D.Colo. 1991). The proffered terms and conditions of employment were found to be unacceptable, particularly the compensation provisions which provided for (1) a flat monthly fee of $150,000.00, plus (2) a fixed $3,000,000.00 success fee, without (3) any provisions or requirement that Smith Barney keep time records relative to services rendered and submit a conventional, legally sufficient fee application for approval of fees. The Court rejected Smith Barney's argument that compensation by flat rate fees without need for time records or fee applications was "customary" in the industry and thus acceptable in Chapter 11 cases. This Court concluded that:

> [U]nder the circumstances of this case, the Debtor-in-Possession cannot employ the two Investment Banking Firms [Smith Barney and Donaldson, Lufkin & Jenrette Securities] because of important deficiencies in, or unreasonable terms of, their employment and fee agreements. The Investment Bankers and Debtor are entitled to reconsideration of this matter, however, the Investment Banking firms must first (1) agree to comply with and be subject to standard bankruptcy fee practices and procedures, (2) modify their indemnification agreements to comport with those putting them on a more comparable basis with other professionals employed by Debtor, (3) make alternative provisions for potential award of success, or bonus, fees, (4) make suitable arrangements for payment of their own attorneys' fees, and (5) make a more persuasive showing of the need and benefit

of employing two investment banking firms.

*Id.*

The Court explicitly stated the terms of employment which would guide Debtor's retention of Smith Barney:

> This Court does not here find that flat monthly payments are never permissible, or *per se* invalid, only that **such payments have not been justified in this case....** [T]he Investment Bankers [including Smith Barney] **will be held to the same basic practice and standards of other professionals if they wish to be employed in this case; this includes filing informative, legally sufficient fee applications which allow for scrutiny and accountability as to the services rendered and fees requested. It also includes application of the 'reasonable compensation' standard to fees paid.**

*Id.* (emphasis in original).

■ The mandate expressed and emphasized in the Court's August 23, 1991 Order could not be more clear. A flat monthly $150,000.00 fee was not acceptable; an hourly billing and accountability practice, subject to a "reasonable compensation" standard, was required. All fees of professionals charged to and paid by the estate are subject to a "reasonableness test." 11 U.S.C. §§ 327(a) and 328(a).[3]

Employment of Smith Barney was subsequently authorized by this Court's Order dated August 29, 1991, *nunc pro tunc* February 27, 1991 which provided, in part, that "employment of Smith Barney shall be in accordance with and subject to this Court's Memorandum Opinion and Order of August 23, 1991."

---

**3.** Assuming, arguendo, that Smith Barney construed the Court's August 23, 1991 Order to accept a monthly flat fee, subject only to an hourly recordkeeping procedure, still a flat fee is subject to a "reasonable compensation" standard; that is inescapable.

**§ 328. Limitation on compensation of professional persons.**

 (a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, **on any reasonable terms and conditions** of employment, including on a retainer, on an hourly basis, or on a contingent fee basis.

11 U.S.C. § 328(a) (emphasis added).

The instant Application requests reimbursement of $55,896.06 in expenses and approval of $800,000.00 in fees calculated as follows:

| TIME PERIOD | FEE SOUGHT |
|---|---|
| 02/27/91 - 06/05/91 | $ 200,000.00 |
| 06/06/91 - 07/05/91 | 150,000.00 |
| 07/06/91 - 08/05/91 | 150,000.00 |
| 08/06/91 - 09/05/91 | 150,000.00 |
| 09/06/91 - 10/05/91.[4] | 150,000.00 |
| TOTAL: | $ 800,000.00 |

The sum of $705,899.06 ($650,000.00 in fees[5] plus $55,896.06 in expenses) has been paid, post-petition, to Smith Barney to date.[6]

## II. DISCUSSION.

*Principles Governing Fee Applications.* Section 330 of the Bankruptcy Code governs compensation of professionals in the bankruptcy context. That section provides, in essence, that a court may award to professionals,

[R]easonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title.

**4.** This Court concludes that Smith Barney intended to seek compensation for the period through October 5, 1991 even though the Application, at page one, states that compensation is requested only through September 30, 1991. Time records and expense records include entries beyond September 30, 1991 and the Cover Sheet accompanying the Application utilizes the October 5, 1991 date.

**5.** Smith Barney agreed, at the December 10, 1991 Creditors' Committee meeting, to request approval of 75% of fees and 100% of out-of-pocket expenses incurred since June 25, 1991, with the remaining 25% of fees to be paid upon further Court order.

| Fees incurred pre-06/25/91 x 100% = | $ 200,000.00 |
|---|---|
| Fees incurred 06/25/91 - 10/05/91 x 75% = | 450,000.00 |
| TOTAL FEES: | $ 650,000.00 |
| Expenses incurred x 100% = | 55,896.06 |
| TOTAL FEES AND EXPENSES: | $ 705,899.06 |

**6.** It must be remembered and it is significant that "Smith Barney and [Donaldson, Lufkin & Jenrette Securities] have already been paid [**prepetition**] $1,400,000 for their contributions to [fact-finding, research, pre-petition 'workout' negotiations, and] the draft Plan of Reorganization prior to the submission of the instant applica-

11 U.S.C. § 330.

In order to determine the appropriate compensation, Rule 2016, Fed.R.Bankr.P., requires that

> A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

Rule 2016, Fed.R.Bankr.P.[7]

■ The burden of proving the value of the services for which compensation is sought is always on the applicant. *See, generally, In re Pettibone Corp.*, 74 B.R. 293, 299 (Bankr.N.D.Ill.1987). "This burden is not to be taken lightly, as 'every dollar expended on [professional] fees results in a dollar less that is available for distribution to the creditors.'" *In re Chicago Lutheran Hospital Ass'n*, 89 B.R. 719, 732 (Bankr.N.D.Ill.1988) (quoting *In re Hotel Associates, Inc.*, 15 B.R. 487, 488 (Bankr.E.D.Pa.1981)).

The primary objective of any fee application is "to provide sufficient data to enable the court to determine whether the services rendered were reasonable, actual, and necessary." *In re Wire Cloth Products, Inc.*, 130 B.R. 798, 806 (Bankr.N.D.Ill.1991). This objective will only be satisfied if the court can, from the application and accompanying documentation itself, pass on all aspects contained therein.[8] *Accord, Chica-*

go *Lutheran Hospital, supra* at 735 ("In all fee requests, the fee application is inevitably the starting point for analysis. It is the crucial document in any fee matter.").

■ Taking a fee application as submitted, this Court has the affirmative duty to examine and, if appropriate, challenge requested fees, even in the absence of objection. *Accord, In re Taxman Clothing Co., Inc.*, 134 B.R. 286 (N.D.Ill.1991) (stating that it might even be an abuse of discretion to fail to challenge an insufficient fee application). *See, generally, In re Gold Seal Products Co., Inc.*, 128 B.R. 822, 827 n. 3 (Bankr.N.D.Ala.1991) (cases cited). *Accord, In re Concept Clubs, Inc.*, 125 B.R. 634, 636 (Bankr.D.Utah 1991) ("The supervision of professional fees is essential to the operation of the bankruptcy law, integral to the bankruptcy system and required by the Bankruptcy Code.").[9]

This Court must determine (1) if the Application itself provides adequate detailed information required for meaningful review, and (2) given adequate information, if the services performed and expenses incurred were actual and necessary, of benefit to the estate, and resulting in a reasonable fee. "If there is a failure of proof in either inquiry, the court cannot approve payment of the affected claim from resources of the bankruptcy estate." *Gold Seal Products, supra* at 828.

■ The Tenth Circuit has established a framework, or checklist, of considerations

---

tion to employ." *In re Gillett Holdings, Inc.*, 137 B.R. 452 (Bankr.D.Colo.1991).

**7.** The Court issued a detailed September 5, 1991 Amended Order Establishing Interim Fee and Expense Reimbursement Application Procedure ("Fee Procedure Order") to govern all of the 11 firms employed as professionals in this case, or otherwise to be compensated out of estate assets.

**8.** Some courts have even gone so far as to state that "[n]ecessary information must be in the fee application itself and should not require an evidentiary hearing. There is authority for the proposition that the fee [application] hearing should not be used as a time to explain the entries on the application." *In re Busy Beaver Building Centers, Inc.*, 133 B.R. 753, 758 (Bankr. W.D.Pa.1991). *Accord, In re Chas. A. Stevens &*

Co., 105 B.R. 866, 870 (Bankr.N.D.Ill.1989) ("fee applications must stand or fall on their own merits.").

**9.** Even though private compensation agreements are permitted under the Bankruptcy Code, this Court "retains the responsibility of ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." *Chas A. Stevens, supra* at 870. *Accord,* House Rep. No. 95–595, 95th Cong., 2d Sess. 40, 1978 U.S.Code Cong. & Admin.News 5787, 5826 ("In a bankruptcy case fees are not a matter for private agreement. **There is an inherent public interest that must be considered in awarding fees ... compensation in private employment ... is a point of reference not a controlling determination of what shall be allowed in bankruptcy cases.**") (emphasis added).

in awarding fees. *Matter of Permian Anchor Services, Inc.*, 649 F.2d 763 (10th Cir. 1981) (adopting the standards set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974)).[10] That framework is to be applied to fees in a bankruptcy case. *In re Grayhall Resources, Inc.*, 1990 WL 314011 (Bankr. D.Colo.1990) (not reported in B.R.).

■ The U.S. Supreme Court has since affirmed the principle that, in awarding fees, a court should start with the "lodestar" method, which is established by applying a reasonable hourly rate to the reasonable number of hours required for the task. *Blanchard v. Bergeron*, 489 U.S. 87, 88, 109 S.Ct. 939, 941, 103 L.Ed.2d 67 (1989). Thus, the starting point, or the centerpiece, for determination of reasonable fees is to apply a reasonable hourly rate to a reasonable number of hours which should have been required to achieve the necessary results and then full consideration must be given to the factors enumerated in *Permian Anchor Services. Id.*

In evaluating the reasonable number of hours required for the task, the Tenth Circuit has observed that the *actual* time expended is not necessarily the *reasonable* time expended. In the private sector, so-called "billing judgment" is an important component in fee setting which is no less important when the fees are to be approved by the Court. *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir.1990); *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983). *See also, Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–1940, 76 L.Ed.2d 40 (1983) (professionals, in applying for fees "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private

practice ethically is obligated to exclude such hours from his fee submission.").[11]

■ Any calculation of reasonable fees, based on services rendered and hours expended, must be leavened with an assessment of benefit accruing to the estate. *Accord, e.g., In re Grabill Corp.*, 110 B.R. 356, 358–359 (Bankr.N.D.Ill.1990). Many hours recorded resulting in no benefit can result in reduced fees and may result in no fees. Billable hours are not necessarily compensable hours. "An increasing attitude in the bankruptcy community is that if the time is actually expended, the applicant is entitled to receive all fees requested. All professionals must be disabused of this fallacious notion." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 871 (Bankr.N.D.Ill. 1989). "In other words, a debtor's estate should not bear the costs of services which were either excessive or duplicative of the efforts of other professionals." *Wire Cloth Products, supra* at 806.

In the final analysis, the setting of fees, whether by this Court or by the professionals themselves, is an art, not a science. *Accord, In re Frontier Airlines, Inc.*, 74 B.R. 973, 979 (Bankr.D.Colo.1987). The fee awarded must ultimately be "a 'reasonable' fee—not the exact fee, not the right fee, but a reasonable fee. 'Reasonableness' is a most subjective standard with a range of acceptability." *In re Grayhall Resources, Inc.*, 1990 WL 314011 (Bankr.D.Colo.1990) (not reported in B.R.).

"Few rulings in a bankruptcy case generate more outrage from the public, anxiety among attorneys, and tribulation for judges than the compensation of officers of an estate" pursuant to Section 330. *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 480 (Bankr.D.Utah 1991). *Accord, In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 15 (Bankr.S.D.N.Y.1991) ("The

10. In awarding fees in bankruptcy matters, the court should consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the issues presented; (3) the skill required to perform the services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results

obtained; (9) the experience, reputation and ability of the professionals; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

11. In the lexicon of Smith Barney, "investment bankers, like other professionals, should make their money the old-fashioned way—earn it."

review of professional fees ... is distasteful to the Court and demeaning to the professional. Unfortunately, however, it is mandated by the Bankruptcy Code."). In view of the fact that the burden of proof as to the entitlement to fees lies on the applicant/professional, however, this Court is not required to "indulge in guesswork," or "undertake extensive labor to justify a fee for an [applicant] who has not done so himself." *In re Horn & Hardart Baking Co.*, 30 B.R. 938, 944 (Bankr.E.D.Pa.1983). "It is not overly burdensome to require that a person seeking compensation from the bankruptcy estate adequately explain the time for which compensation is sought." *Chicago Lutheran Hospital, supra* at 735–736.

■ As this Court has previously stated, investment bankers are subject to the mandates of Rule 2016, Fed.R.Bankr.P., which requires that any entity seeking compensation must file an application setting forth a meaningful statement of services rendered, time expended, and expenses incurred. "This Court is constrained to conclude that the Bankruptcy Rules are controlling, not

the general policy or custom of investment advisors which prevails in the operation of the business [of] investment bankers or advisors." *In re Hillsborough Holdings Corp.*, 132 B.R. 482, 483 (Bankr.M.D.Fla. 1991).[12]

### III. SMITH BARNEY FEE APPLICATION— DISCLOSURE.

Smith Barney's fee Application, or more accurately, the quality and quantity of information supplied in support of its fee request, is deficient in important respects.[13]

■ 1. *Time Records—Hourly Rates.* Despite the fact that Smith Barney asks this Court to approve fees since February 27, 1991, no time records have been submitted for dates before June 11, 1991.[14] The $200,000.00 request for February 27, 1991 through June 5, 1991 is, consequently, absolutely unsupported by time records or related documentation.

The time records appended to the Application can be summarized as follows:

**12.** One court has summarized the customary practice of compensating investment bankers as follows:

> All investment bankers/advisors want sizeable monthly retainers regardless of the size of the case, the party represented, or the complexity of the case. Mathematically a correlation of fees, cases, and clients shows, at worst, incestuous fee-setting practices or, at best, oligopolistic behavior.... Whenever we have dealt with investment bankers and financial advisors we have been left with the strong impression that for them the debtor is the cash cow to be milked, Chapter 11 the milking parlor, and the Judge the milking stool ... it is clear the investment bankers want to sip the cream and leave the skimmed milk for others.
>
> *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 26 (Bankr.S.D.N.Y.1991).

**13.** This Court must emphasize that it is the poor and incomplete billing time records, inadequate fee application, and absence of a narrative, or sufficient descriptions of services rendered and tasks performed, that are important reasons for the fee reduction. "But for" these features, Smith Barney might well qualify for more favorable fee treatment.

**14.** At the hearing on this matter, counsel for Smith Barney explained, "I did not believe this Court wishes to see retroactive breaking out of time that was not contemporaneously kept in terms of allocation per task [sic]." While this Court acknowledges that the reconstruction of time records is difficult if not impossible, and that, if done, the reliability of such records would be suspect, this Court also notes that some, if not all, of the Smith Barney time records presently before this Court are not contemporaneously-kept, but were reconstructed. *See, e.g.*, 06/28/91, Benninger, 0.5 hour "Record keeping"; 07/17/91, Benninger, 0.5 hour "Record keeping"; 07/31/91, Benninger, 0.5 hour "Recordkeeping"; 08/15/91, Benninger, 0.5 hour "Recordkeeping"; 08/19/91, Nora, 1.3 hours "Pull hours for billing period through 08/05/91"; 08/21/91, Benninger, 1.0 hour "Recordkeeping"; 08/29/91, Cramer, 0.5 hour "Record keeping"; 09/07/91, Cramer, 0.5 hour "Record Keeping"; 09/09/91, Nora, 0.5 hour "Write-up of hours for billing"; 10/03/91, Benninger, 0.75 "Timekeeping." While preparation of fee applications for bankruptcy courts is customarily compensable, simply keeping descriptive, useful time records for edification of the client, creditors and court is, typically, not compensable.

| | 06/11- 07/05 | 07/06-08/05 | 08/06-09/05 | 09/06-10/05 | TOTAL |
|---|---|---|---|---|---|
| Benninger | 46.0 | 151.4 | 127.6 | 111.8 | 436.8 |
| Nora | 32.0 | 64.5 | 101.68 | 101.65 | 299.83 |
| Venturi | 0.0 | 39.0 | 31.0 | 22.5 | 92.5 |
| Curtis | 0.0 | 0.0 | 92.55 | 7.3 | 99.85 |
| Cramer | 18.0 | 7.5 | 109.4 | 3.75 | 138.65 |
| TOTAL: | 96.0 | 262.4 | 462.23 | 247.0 | 1067.63 |

This Court has not been supplied with either an hourly rate for the above-referenced professionals or adequate, useful information about their respective levels of experience, expertise, and professional qualifications, from which the relative value of each of their services can be ascertained.[15] The Court appreciates that these professionals have not traditionally, and do not routinely today, bill on an hourly basis. Nonetheless that figure, an hourly rate, at least provides a scale, a benchmark, by which value of services might be weighed and against which reasonable fees might be measured.

In the absence of any supplied hourly rate information, by necessity, the Court must rely upon rather crude mathematical computations to ascertain a rough hourly rate charged. Using the totals developed above, the following weighted or blended rates are found:

| | FEES | HOURS | BLENDED RATE |
|---|---|---|---|
| 06/11 - 07/05 | $ 150,000 ÷ | 96.0 = | $1562.50/hour |
| 07/06 - 08/05 | 150,000 ÷ | 262.4 = | 571.65/hour |
| 08/06 - 09/05 | 150,000 ÷ | 462.23 = | 324.51/hour |
| 09/06 - 10/05 | 150,000 ÷ | 247.0 = | 607.29/hour |
| TOTAL: | $ 600,000 ÷ | 1067.63 = | $ 562.00/hour |

The average hourly rate for Smith Barney's professionals is $562.00.[16]

This Court recognizes the fact that the Application states that "numerous [other]

15. The all-too brief biographical sketches of the individual professionals involved do not adequately specify the type and length of experience, level of expertise, or other useful information which is necessary in assessing their respective skill levels and qualifications. In fact, two "resumes" of Smith Barney's five billing professionals (Curtis and Cramer) provide virtually no information on the professionals' background, work experience, or expertise; they consist of a single entry relating the year that they joined Smith Barney and the college degree received, but not the year that they completed their college education. The Court must, here, infer that Messrs. Curtis and Cramer are fresh out of college with no prior work experience.

16. The Tenth Circuit has recently noted in the bankruptcy context: "As a general comment, we observe that $150 is a more than generous hourly fee." *Smith v. Freeman,* 921 F.2d 1120, 1122 (10th Cir.1990). While this *dicta* is certainly not controlling, it is rather interesting when reviewing hourly rates which average about $562.00 per hour for Smith Barney.

professionals" have spent "significant" amounts of time on the case. Absolutely no names, numbers, titles, useful identification of tasks or responsibilities, or other information has been supplied regarding these individuals. Smith Barney laments: "[T]he nature of many of the services provided by Smith Barney cannot ... be captured in time records (research, trading, municipal finance, for example) numerous other professionals who have spent very significant amounts of time are not listed." *Supplemental Application*, p. 2. This Court must pause to wonder why; why is it impossible for these "numerous" billing professionals to record and account for their time? They need not do it in a slavish or perfect manner, but some type of accounting and accountability is not impossible. Virtually all other professionals and paraprofessionals, who provide billable services appear, to a greater or lesser degree, capable of keeping time records: attorneys, paralegals, accountants, investigators, expert witnesses of all types, law clerks, secretaries, and so forth. Those who typically cannot or do not keep time records might be considered overhead ... a cost of doing business. When it was argued at the hearing on the issue of employment that personnel on the trading floor could not keep contemporaneous time records, this Court conceded that "[a]lternative means of accounting for such 'hidden resources' as trading floor personnel need, perhaps, to be developed." *In re Gillett Holdings, Inc.*, 137 B.R. 452 (Bankr.D.Colo.1991). Having recognized that difficulty, still this Court is not persuaded that professionals or paraprofessionals should be entirely exempt from recording and accounting for their time and services in a bankruptcy reorganization.

In any event, this Court must analyze and deal with the information currently and properly before it and consider, but discount, the credit Smith Barney seeks for these undisclosed and unnamed professionals and paraprofessionals. *See, generally, In re Busy Beaver Building Centers, Inc.*, 133 B.R. 753 (Bankr.W.D.Pa.1991) (compensation for paraprofessional services will be allowed when the services are shown to require independent judgment and decision-making, and conversely will be denied for work that is secretarial or clerical in nature.).

2. *Sufficiency of Time Entries.* With regard to the actual time entries before this Court, many of them are cryptic and remarkably similar to the "inadequate or incomplete" examples, the deficient examples, illustrated by the Court in its September 5, 1991 Amended Order Establishing Interim Fee and Expense Reimbursement Application Procedure, p. 7, n. 5. *See, e.g.,* 06/11/91, Cramer, 5.0 hours "Liquidation Analysis (Valuation)"; 06/25/91, Benninger, 2.0 hours "Work with Press"; 07/26/91, Venturi, 2.0 hours "Objections to case and fee application"; 08/13/91, Curtis, 3.0 hours "Calls with Fitzgerald, Moskel, regarding Liquidation Analysis. Review financial models." Counsel for Smith Barney argues that the personnel were neither aware of nor accustomed to the amount of detail that this Court demands and/or the Bankruptcy Code requires until they received the September 5, 1991 Order and that, consequently, some latitude in this regard should be extended.[17] Counsel is correct, but the inadequacies continued after that date. *See, e.g.,* 09/12/91, Nora, 2.0 hours "Comments to Winston on Stockholder Agreement"; 09/17/91, Benninger, 2.0 hours "Gillett conference call with Apollo re: Management Agreement"; 09/17/91, Venturi, 2.25 hours "Conference Call on Management Agreement Draft"; 09/20/91, Nora, 2.0 hours "Continue discussion on Vail Real Estate." While a marked improvement in the quality and content of the time records is evident,[18] there remain far too many multi-hour telephone calls, con-

---

17. Smith Barney alleges that these reporting requirements came as an unfair surprise, even though these examples were taken verbatim from the Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases which were issued some time prior to this Court's Order.

18. Improvement is noted in the entries of Mr. Cramer in particular. Entries such as 06/11/91, 5.0 hours "Liquidation Analysis (Valuation)," have subsequently evolved into those such as 08/07/91, 7.5 hours, "Begin updating financial model (including revising capital structure and operating assumptions) to reflect

ference calls, meetings and discussions lacking in any meaningful description and justification for this Court to ascertain the usefulness or reasonableness of the entries from the face of the Application itself.

This Court has, to the extent that the time entries allow, broken the recorded time into the following categories:

| CATEGORY | HOURS | PERCENTAGE |
|---|---|---|
| Conference calls or telephone calls | 252.88 | 23.69% |
| Travel time | 195.00 | 18.26% |
| Meetings or discussions | 188.50 | 17.66% |
| Purely interoffice meetings | 17.90 | 1.68% |
| Plan and disclosure statement | 139.90 | 13.10% |
| Liquidation analysis | 104.35 | 9.77% |
| Creditor presentation | 88.75 | 8.31% |
| Fee or retention matters (including record keeping) | 16.05 | 1.50% |
| Attendance at court hearings | 10.00 | 0.94% |
| Confidentiality Agreement, Management Agreement and Shareholder Agreement | 11.80 | 1.11% |
| Press Release | 9.50 | 0.89% |
| Other | 33.00 | 3.09% |
| TOTAL: | 1067.63 | 100% |

This categorization allows for a better picture of time allocation, nature and extent of services rendered, and relative reasonableness of fees charged for different tasks and activities. It is not decisive, but this "work category" breakdown helps the Court in trying to find a reasonable (not the perfect) fee.

3. *Measuring Reasonableness of Fees Requested.* This Court, in the absence of detailed, complete or meaningful time records or fee application disclosures, is less able to apply a reliable lodestar ap-

proach and must look instead to increased reliance upon the *Permian Anchor Services* criteria. *See, generally, Norman v. Housing Authority of City of Montgomery,* 836 F.2d 1292, 1302 (11th Cir.1988) (the lodestar amount must be adjusted according to the results obtained).

With respect to justifying its fee request, Smith Barney has attempted in its Application to discuss, in summary fashion, the factors set forth in *Permian Anchor Services* and *Johnson v. Georgia Highway Express.* This Court is thus informed, for

Reorganization Plan and revised operating projections" [more detail, yet still a large time "lump"] to 08/09/91, 1.0 hour, "Call with D. Ramon regarding Liquidation Analysis," 2.25 hour, "Update Liquidation Analysis model based on comments from Benninger, Curtis," 3.0

hours, "Continue updating financial model (add revolvers at subsidiaries)" 1.25 hours, "Call with Kornder re: detail of interest expense at subsidiaries and outstanding debt balances at subsidiaries."

example, as to the length of Smith Barney's professional relationship with the Debtor[19] and Smith Barney's standing in the industry, reputation, and investment banking ability. This Court is also, generally, familiar with the types of services rendered, both those that are supported by time records and those ascribed to the nebulous and incorporeal "numerous" people in other departments. Further, this Court assumes that Smith Barney's statement regarding preclusion of other employment is accurate.

The Application also points out the novelty and difficulty of this reorganization, the "diverse and unrelated businesses and an extremely complex capital structure."[20] In fact, most all of the *Permian Anchor Services* elements are at least briefly discussed by Smith Barney. One problem, however, is that the elements are too briefly discussed and Smith Barney fails entirely to discuss two of them—"the amount involved and the results obtained," the very factors missing from a pure lodestar analysis. *Johnson v. Georgia Highway Express, supra* at 718. *Accord, In re Bicoastal Corp.*, 131 B.R. 499, 501 (Bankr. M.D.Fla.1991). In short, this Court has a general, but not specific, useful or meaningful, disclosure from Smith Barney, as to the *Permian Anchor* criteria.

19. *See*, n. 6, *infra.*

20. As an aside, this Court notes that this "extremely complex capital structure" was designed and engineered, at least in part, by the firm of Drexel Burnham Lambert—the training ground for at least three of the professionals (now at Smith Barney) here responsible for, and seeking generous compensation for, unknotting this financial Gordian knot.

21. Smith Barney had apparently done a great deal of work in these areas pre-petition and has been fully compensated therefor. Smith Barney was paid $1,100,000.00 in fees by this Debtor during the 12 months prior to February 27, 1991, when the Involuntary Petition was filed.

22. In fact, one entry by Mr. Benninger is particularly troublesome. While in New York on July 23, 1991, he billed as follows:

| 6 | NYC 07/23 | Meeting with Apollo: Def. Comp., Rec., Equity Loan et al. |
| 3 | | Meeting with N. Brownstein regarding Apollo Meeting |

Examination of time and task allocation (see previous chart), at least to the degree the time records and fee Application allow, reveals certain questions and problems, which are briefly illustrated by the following examples.

(a) *First example, 461.08 hours conferencing:* By far the largest number of hours spent since June 5, 1991 by Smith Barney was for talking and negotiating; for participating in conference calls, telephone calls, meetings, discussions, and/or interoffice conferences, often with more than one Smith Barney participant. Some 461.08 hours, or over 43% of the time billed, has thus not been spent on producing hard documentation, such as liquidation analyses, information for the presentation made to the Creditors' Committee, or even a plan and disclosure statement.[21] The Court knows that communication and negotiation are central features of the reorganization process. While these telephone calls, meetings, conferences, and so forth, which have purportedly occupied upwards of twelve or more hours a day for some of these Smith Barney professionals,[22] may well have benefitted the negotiating and decision-making process, still it is not up to this Court to speculate on that and thereby create justification for these efforts. *Chicago Lutheran, supra* at 739 ("the stan-

| 3 | Call with D. Ramon, C. Christensen regarding Apollo Meeting |
| .5 | Call with L. Rosenbloom regarding Apollo Meeting |
| 1 | Call with G. Gillett regarding Apollo Meeting |
| 9.5 | Travel to SF—2 hr. Delay on plane. Arrive 2:30 a.m. |

This entry totals 23 hours, even accounting for the three hour time difference between New York and San Francisco and the stated arrival time early Wednesday morning, July 24, 1991 (assuming even local time stated for arrival) this would mean that Mr. Benninger was either in a meeting or on the phone *constantly, without a break,* since 6:30 a.m. eastern time until the moment that he stepped onto the airplane. This Court must conclude either (1) the time spent, if actual, was not entirely productive and beneficial to the estate, or (2) the time records are not entirely accurate.

dard for fee awards is not an educated guess."). The billing records and fee application disclosure are simply not adequate to demonstrate that this number of hours was either (1) productive, (2) useful, (3) genuinely necessary to the reasonable completion of the tasks assigned to Smith Barney, or (4) beneficial to the estate.[23]

This view is reinforced in that there appears to be numerous instances where more than one professional, sometimes several, from Smith Barney have billed the estate, full fare, for such telephone or in-person meetings without providing any explanation or sufficient justification for the participation of multiple representatives. *See, generally, Wire Cloth Products, supra* at 812; *Chicago Lutheran Hospital, supra* at 736 (noting that there is a difference between duplication and coordination of services but such difference must be proven by showing some specific reason for the contribution of the additional person(s)).

(b) *Second example, repetitive or unnecessary work:* In addition to multiple Smith Barney professionals at conferences, numerous hours have been spent by various professionals at Smith Barney reading or reviewing the work product of others within the organization.[24] Certainly some, perhaps all, of that time is necessary and useful. However, the Court is given little information to discern this. Unless these entries suggest what that particular individual's "review" might have added to the document in question, or why it was conducted, or at whose request, such efforts appear duplicative of the other assumedly competent, well-trained, billing professional. *Accord, e.g., Chicago Lutheran Hospital, supra* at 739–740.

(c) *Third example, 195 hours travelling:* Also troublesome is the number of hours spent travelling for which the estate has, in effect, been billed. Some 195 hours, a clear 18% of the time, was spent either in the air or driving between Denver and Vail. Using a rough measure of time value, travel time compensation to Smith Barney professionals comes to about $109,590.00 (195 hours $\times$ $562.00 per hour).

Over 30% of this time actually consists of trips taken by more than one professional from Smith Barney to the same destination at the same time, for which the necessity of attendance of more than one professional from Smith Barney has not been shown. (In fact, the necessity of even *one* person from Smith Barney has not been shown—particularly where meetings, in Vail for example, might have been more expeditiously and economically conducted via conference call.) This Court has previously held that travel time is compensable for professionals. However, some times, under certain circumstances, even when travel is reasonably necessary, it may not be fully compensable because "it is rarely totally productive." *In re Automobile Warranty Corp.*, 138 B.R. 72, 78 (1991) (citing *In re Microwave Products of America, Inc.*, 104 B.R. 900, 908 (Bankr.W.D.Tenn. 1989) and *Matter of Pothoven*, 84 B.R. 579, 585 (Bankr.S.D.Iowa 1988) and finding that allowing travel time to be billed at one-half the normal hourly rate is more than charitable).

■ (d) *Fourth example, timekeeping:* As a general rule, "professionals customarily factor into their hourly rate the noncompensable time for keeping contemporaneous time records." *CF & I Fabricators, supra* at 483. Those professionals not used to practicing in Bankruptcy Court may complain about the onerous time-keeping requirements but

[p]rofessionals hired by the estate accept employment knowing they will be re-

---

**23.** The Court is cognizant of the fact that these 461.08 hours may *all* be productive, useful, and beneficial, but that determination cannot be made, with confidence, without better information from Smith Barney or until the conclusion of the case, after a clear picture of the reorganization process emerges. Also, see discussion of "success fee," *infra.*

**24.** *See, e.g.,* 07/18/91, Nora, 5.0 hours "Read new Plan Document"; 09/16/91, Nora, 1.3 hours "Continue reading Disclosure Statement"; 09/25/91, Nora, 1.5 hours "Read Articles II and III of Disclosure"; 09/26/91, Nora, 2.0 hours "Read Articles V and VI of Disclosure Statement"; 10/02/91, Nora, 1.0 hour "Read Article IX and Exhibits to Disclosure."

quired to account for their time in detail. The debtors, after all, are in bankruptcy and the professionals are being paid by a fiduciary estate under court supervision.... Keeping time records is an integral aspect of bankruptcy representation and is not entitled to additional compensation.

*Id.,* at 484.

The portion of time billed for such tasks as "record keeping" is, consequently, not compensable. This is to be distinguished from preparation of a fee application which is compensable. *Id.,* at 487. *See, generally, In re Kreidle,* 85 B.R. 573, 575 (Bankr. D.Colo.1988). Professionals, such as Smith Barney, that are unaccustomed to practice before bankruptcy courts should, however, be given a reasonable amount of time to educate themselves on law and practice regarding fee application which would otherwise be well known to regular bankruptcy practitioners. "Given a small amount of instruction, however, these billing concepts should not be difficult to grasp." *CF & I Fabricators, supra* at 485.

Finally, certain other tasks appear to have been either (1) outside the scope of Smith Barney's employment,[25] or (2) purely ministerial tasks not befitting the expertise of these professionals and/or more properly viewed as overhead.[26]

### IV. THREE MILLION DOLLAR SUCCESS FEE.

Smith Barney has negotiated a $3,000,000.00 success fee to be paid if the reorganization succeeds. That is, of course, in addition to the $150,000.00 per month flat fee.

Obviously, this success fee, or bonus, cannot be ignored in evaluating the overall compensation package. Even more obvious, it must be fully considered, in addition to the $1,100,000.00 paid to Smith Barney pre-petition, when measuring the reasonableness of these $800,000.00 in fees requested on an interim basis.

The success fee is a tool by which to reward, and reward handsomely, the investment bankers if the reorganization process works. It is an enhancement, a bonus, a sweetener, for a job particularly well done. So, given the likelihood, or at least possibility, of a $3,000,000.00 bonus, where does the $150,000.00 monthly flat fee fit in with the compensation package? Is it intended to be fair, reasonable compensation for customary, routine, generally competent services provided by Smith Barney, in the ordinary course, even in the absence of a successful reorganization? This Court presumes so.

The Court will, consequently, treat the request for the flat $150,000.00 monthly fee on its own, stand alone, merit. The monthly compensation should thus be measured as to value and reasonableness of actual, necessary services rendered on a monthly basis.

### V. CONCLUSION AS TO FEES.

Even though the Application is described as containing "[a] full and complete description of the services rendered, the date the services were provided, the name of the investment banker providing the services and the time spent providing the services" (Application, p. 2), this Court is unable to agree with that characterization. The Court is simply unable to conclude that $800,000.00 worth of services have been rendered for the benefit of the estate. This Court is cognizant of the "strange and wonderful" world of investment banking where such relatively risk-free arrangements are commonplace, but this is the

---

**25.** *See, e.g.,* the cumulative 9.5 hours spent on matters related to the press. *See, generally, In re Heck's, Inc.,* 112 B.R. 775 (Bankr.S.D.W.Va. 1990).

**26.** *See, e.g.,* 07/05/91, Nora, 5.0 hours to "Update filings for Court"; 07/17/91, Benninger, 4.0 hours to "Fax Briefs and Signature Pages back and forth (until 10 p.m.)"; 09/06/91, Benninger, 2.5 hours to "Supervise assembly/distribution of Creditor books." If these services are befitted by the expertise of these persons, then a brief description of the type, nature, or extent of work would have avoided this incorrect inference.

world of bankruptcy ... this is reality.[27] *Matter of Baldwin–United Corp.*, 79 B.R. 321, 351 (Bankr.S.D.Ohio 1987). This Court is bound by the Bankruptcy Code with "the responsibility of ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." *Chas. A. Stevens, supra* at 870. This responsibility does not bow to the customs and practices of any profession, even investment banking.

The instant Application, for all the reasons cited above, utterly fails to establish that $150,000.00 per month is a reasonable fee rate, or "reasonable compensation for actual, necessary services rendered." 11 U.S.C. § 330(a)(1). In the absence of an explanation and justification as to the value of these services, this Court will not allow the fees, as requested, to be paid out of funds of the estate.

For the interim fee award,[28] the Court will instead award reasonable fees based on a relative fee rate schedule of those other highly qualified, experienced, and competent professionals who are providing comparable, quality services to the Debtor and to Smith Barney. Debtor's counsel, Brownstein Hyatt Farber & Madden's (now Strickland) average, or blended, billing rate to the Debtor is "approximately" $225.00 per hour. Smith Barney's counsel, Latham & Watkins' average, or blended, billing rate to Smith Barney is approximately $275.00 per hour. Extrapolating from these figures, the Court will settle on an hourly fee rate of $250.00 as a measure for the reasonableness of Smith Barney's compensation rate. Using the appropriate figures, Smith Barney's reasonable fee for *all services and time expended*, between June 6, 1991 through October 5, 1991, would be approximately $266,907.50.[29] That represents 44.48% of the $600,000.00 requested for that period of time, or a reduction of $333,092.50. Applying that same formula to the additional $200,000.00 in fees Smith Barney requested for unspecified time and services, between February 27, 1991 and June 6, 1991, results in an additional award of $88,960.00, or reduction of $111,040.00. Total interim fees allowed for Smith Barney, from February 27, 1991 through October 5, 1991 would, initially, thus be $355,867.50.

The Court will deduct from that figure (a) one-half (50%) of the time allocated to travel, or $24,375.00 (195 hours × $250.00 per hour), and (b) $33,149.25, or ten percent (10%), for the specified billing, recordkeeping, fee application deficiencies, and award the sum of $298,343.25 as and for final interim fees for the period commencing February 27, 1991 through October 5, 1991.[30]

## VI. EXPENSES.[31]

 The applicant also carries the burden of establishing that it is entitled to the reimbursement of expenses. "The

---

**27.** "While this Court has previously stated on the record that the world of investment banking must be a strange and wonderful place, we are unable to conceive of a world where four people working part time over a period of ten months can be paid $550,000, and then be paid a bonus of $1.5 million for their efforts. Shearson did what it said it would do, got paid handsomely for it, and incurred little, if any, risk in the process. It is entitled to nothing more. Such is the world of bankruptcy." *Matter of Baldwin–United Corp.*, 79 B.R. 321, 351 (Bankr.S.D.Ohio 1987).

**28.** This may be adjusted or modified at the time Smith Barney's final fee application is considered.

**29.** (1,067.63 hours × $250.00 per hour = $266,907.50.)

**30.** The formulation for disallowance of the $150,000.00 flat monthly fee rate and award of

this particular fee is a treatment of the issue as a package. The Court is, based on the calculated hourly fee rate, discounting the total requested fee deeply to reach a reasonable fee. If it were argued that the total monthly, or hourly rate of $562.00, was itself reasonable then deep discounting would still be necessary for the deficiencies and defects in recordkeeping, fee application, measurable benefit to the estate, and so forth, as is often done with all other professionals, to a greater or lesser degree, in this case and other Chapter 11 cases.

**31.** The Court urges Smith Barney to supplement its expense documentation and information with a motion to reconsider expense reimbursement. Smith Barney may avoid losing its out-of-pocket expenses by providing more adequate documentation and explanation.

Court will not assume any expense is necessary.... An expense is necessary if it was incurred because it was **reasonably** needed to accomplish the proper representation of the client." *In re Convent Guardian Corp.*, 103 B.R. 937, 939 (Bankr. N.D.Ill.1989) (cases cited) (emphasis added). The Application states: "In all instances Smith Barney sought to comply with the Court's orders and to conserve [the Debtor's] resources." Application, p. 3. This Court is bound to test the accuracy of that statement.

Smith Barney requests that this Court authorize the reimbursement of the following expenses:

| EXPENSE | AMOUNT |
|---|---|
| Airfare | $43,897.58 |
| Lodging | 7,847.26 |
| Local Transportation | 2,751.42 |
| Meals | 1,036.63 |
| Miscellaneous: | |
| Airport Parking | 980.50 |
| "Tips and Telephone" | 404.15 |
| Local Gas and Mileage | 185.00 |
| Cellular Phone | 96.45 |
| Facsimile Charge | 24.00 |
| Gas for Rental Car | 16.30 |
| Copies (Notarized) | 5.00 |
| Unknown[32] | 11.00 |
| TOTAL: | $57,255.29 [33] |

1. *Airfare.* Smith Barney requests reimbursement of $43,897.58 in airfare. Prior to the submission of the supporting documentation in the Supplemental Applica-

---

**32.** Because of the similarity in amount to entries for local gas and mileage, this Court will treat this item as such.

**33.** Once again, the Application and documentation disagree. The Application makes a request for reimbursement of expenses of $55,896.06. This Court will utilize the higher number since its analysis deals with the actual receipts rather than the stated amount.

tion, this Court was unable to ascertain the specific elements of this category of expenses and would not have allowed any reimbursement therefor. Upon consideration of the supplemental documentation, however, several problems are presented. First, Smith Barney requests a substantial reimbursement for the period *prior* to June, when time records began to be maintained.[34] This Court is, consequently, compelled to find this portion of the expense incompensable as not being proved reasonably necessary.

■ Secondly, certain of the receipts are illegible in whole or in part and the cost of at least one appears to have been obliterated, advertently or inadvertently.[35] Substantial, undocumented expenditures cannot be allowed. Further, the amounts listed on the expense itemization statement for the illegible receipts appear, in some cases, to contain an upgrade fee [36]—which leads this Court to its third point, the element of airfare upgrades.

■ The estate will not pay for airline upgrades. The Court's September 5, 1991 Fee Procedure Order specifically prohibited airfare in excess of coach rates. Why Smith Barney is now requesting it is beyond understanding. Air travel to be paid for by the Debtor is to be not in excess of coach fare. *Accord, Convent Guardian, supra* at 942. *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 835 (Bankr.

D.N.H.1988); *In re Kaiser Steel Corp.*, 74 B.R. 885, 896 (Bankr.D.Colo.1987). *But see, In re NBI, Inc.*, 129 B.R. 212, 231 (Bankr.D.Colo.1991) (allowing business coach or first class upon written justification in certain circumstances.).

Fourth, air travel in this case appears ubiquitous and airfares appear high. Recognizing that it may all be necessary, nonetheless, there is no explanation, or description, as to why it is necessary or beneficial to the estate. More importantly, there is little evidence that travel and airfare expenses have been allocated, or apportioned, among the different clients of Smith Barney who were being served by the Smith Barney professionals concurrently with the Debtor. Available information allows an inference that these professionals were not all serving the Debtor's interests, exclusively, full-time, during the billing period.

Finally, this Court must consider duplication. In many circumstances, two, three, or even four Smith Barney personnel travelled to Denver, or to other cities, for meetings. Without explanation, adequate justification and sufficient showing of need, the expenses of the excess personnel will not be allowed against the estate. In these situations, this Court will allow only the expenses of the most senior member of the excursion party unless a more junior member remained in the visited city longer, in which case, his expenses will be allowed.[37]

34. In addition, (a) at least $1,040.00 of these expenses appear to be airfare upgrades; (b) Mr. Nora's 04/09/91 Los Angeles receipt is unreadable, but appears to contain an upgrade; and (c) on 05/02/91, Mr. Nora appears to have paid $225.50 for Mr. Ramon's ticket too. Mr. Ramon is an officer of the Debtor herein.

35. *See,* document number 20 attached to Mr. Nora's expense request.

36. The following receipts are illegible: Mr. Benninger, 06/27/91, 09/04/91, and 09/06/91;

Mr. Nora, 07/03/91, 08/15/91, 08/16/91, 08/28/91, and 09/02/91; and Mr. Cramer, 09/05/91 (Referenced receipt is for August not September travel).

37. On the 08/29/91—08/30/91 and 09/30/91—10/01/91 visits, the length of Mr. Nora's stay exceeded that of Mr. Benninger. (This Court, in so allocating, makes a necessary assumption that the professional's seniority is accurately reflected by the order that they are listed in the Application.)

This Court, in analyzing the airfare expense, has created the following summary:

| PROFESSIONAL | TOTAL REQUEST | PRE-TIME RECORDS | NO RECEIPT | WHEN RECEIPT EXISTS | | AMOUNT ALLOWED |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | UPGRADE | DUPLICATION | |
| Benninger | $21,456.58 | $12,160.50 | $1,359.08 | $240.00 | $1,630.00 | $6,067.00 |
| Nora | 16,516.00 | 10,796.50 | 2,141.00 | 165.00 | 1,830.00 | 1,583.50 |
| Venturi | 1,628.00 | 0.00 | 0.00 | 0.00 | 1,628.00 | 0.00 |
| Curtis | 2,781.50 | 0.00 | 0.00 | 235.00 | 2,546.50[38] | 0.00 |
| Cramer | 1,515.50 | 0.00 | 443.00 | 0.00 | 1,072.50 | 0.00 |
| TOTAL: | $43,897.58 | $22,957.00 | $3,943.08 | $640.00 | $8,707.00 | $7,650.50 |

2. *Lodging.* Smith Barney presents receipts for hotel expenses in the aggregate amount of $7,847.26 and requests reimbursement therefor. In view of Smith Barney's predisposition for first-class airfare, their choice of lodging is, not surprisingly, generally at the upper end of the price scale. While in New York City, Mr. Benninger customarily stayed at the Rihga Royal Hotel, with bills averaging $230.00 per night. Similarly, while in Chicago, Messrs. Benninger, Nora, and Curtis usually patronized the Hotel Nikko, for about $180.00 per night. While in Denver, almost without exception, the professionals registered at the Downtown Hyatt, a hotel that is moderately priced for that area and relatively close to Debtor's attorneys' offices. Lodging expenses appear high, but are reasonable.

Reimbursement of travel expenses should not include accommodations in a locale's most expensive hotels when reasonable alternatives are ordinarily available. *Accord, Public Service Co. of New Hampshire, supra* at 835. Although some courts have set caps on daily expenditures for lodging and food that will be allowed (*see, Chas. A. Stevens, supra* at 874; *Kaiser Steel Corp., supra* at 896–897), this Court believes that the circumstances of each case must be considered and that such preimposed spending limits may be inappropriate. *Accord, In re Western Co. of North America,* 123 B.R. 546 (N.D.Tex.1991).

In summary, this Court will allow the following reimbursement of lodging expenses for one individual per trip[39]:

**38.** Included in this amount is a 08/06/91–08/07/91, New York–Chicago–San Francisco trip by Mr. Curtis during which time he logged no work hours in either New York or Chicago, only time on 08/17/91 in San Francisco.

**39.** As the necessity or reasonableness of more than one person from Smith Barney has not been demonstrated, this Court will treat lodging as it did airfare.

| PROFESSIONAL | TOTAL REQUESTED | PRE-TIME RECORDS OR DUPLICATION | AMOUNT ALLOWED |
|---|---|---|---|
| Benninger | $ 4,075.90 | $ 2,582.28 | $ 1,493.62[40] |
| Nora | 2,936.29 | 2,141.51 | 794.78 |
| Venturi | 315.66 | 315.66 | 0.00 |
| Curtis | 272.75 | 272.75 | 0.00 |
| Cramer | 246.66 | 246.66 | 0.00 |
| TOTAL: | $ 7,847.26 | $ 5,558.86 | $ 2,288.40 |

3. *Local Transportation.* Smith Barney requests $2,751.42 as reimbursement for local transportation—taxis, rental cars, and limousines. Of that total, some was incurred prior to the time when time records were kept and are not reimbursable due to a lack of showing necessity. Of the remaining sum, although the taxi fares are substantiated by far from the clearest documentation, this Court will allow the expense as follows:

| PROFESSIONAL | TOTAL REQUESTED | PRE-TIME RECORDS OR DUPLICATION | AMOUNT ALLOWED |
|---|---|---|---|
| Benninger | $ 934.79 | $ 600.21 | $ 334.58 |
| Nora | 1,512.13 | 1,182.13 | 330.00 |
| Venturi | 88.00 | 88.00 | 0.00 |
| Curtis | 140.50 | 140.50 | 0.00 |
| Cramer | 76.00 | 76.00 | 0.00 |
| TOTAL: | $ 2,751.42 | $ 2,086.84 | $ 664.58 |

4. *Meals.* Smith Barney requests compensation of $1,036.63 for meals. Mr. Cramer charged six "Late Dinners" to the estate over a two-week period while he remained in the San Francisco office. This Court deems these not to be reimbursable

40. Of this total, $175.06 was paid to Vail Associates Hospitality Corp., Avon, Colorado, a subsidiary of Debtor.

for several reasons. First, two of these charges were incurred on days Mr. Cramer logged *no time* whatsoever working on the instant bankruptcy case. Secondly, at least two of the charges were incurred on days when Mr. Cramer logged five hours or less of time spent on the case. This estate should not have to pay for Mr. Cramer's meal just because he chose to work on other matters during regular business hours and the instant bankruptcy case during the evening. Third, it is unlikely that local meals are chargeable against any estate since any professional would have to eat, whether or not he/she was working on a debtor's case.

■ The remaining request for reimbursement of the meal expense will also be disallowed. This Court has been provided, in most cases, by the flimsiest of documentation or none at all. All of the requests are lacking in one or more of the following specifics: (1) name of restaurant; (2) names of diners; (3) purpose of the meeting; and (4) breakdown between food, alcoholic beverage, and tip.[41] Even if the above-referenced detail is provided, this Court will not compensate professionals for extravagant meals or for meals at posh restaurants.[42] *See, generally, Convent Guardian, supra* at 942.

■ 5. *Miscellaneous.* Of the $1,722.40 in expenses grouped in this category, this Court will not allow the $185.00 charge for local gas and mileage. This item is more properly overhead to Smith Barney as a cost of doing business. Additionally, in conformance with the other portions of this Order, expenses incurred as a result of unsubstantiated duplicate travel and/or incurred before time records were kept will not be compensable. The Miscellaneous category may be summarized as follows:

| CATEGORY | TOTAL REQUESTED | OVERHEAD | PRE-TIME RECORDS OR DUPLICATION | AMOUNT ALLOWED |
|---|---|---|---|---|
| Airport Parking | $ 980.50 | $ 0.00 | $ 682.50 | $ 298.00 |
| Tips and Telephone | 404.15 | 0.00 | 329.17 | 74.98 |
| Local Gas and Mileage | 185.00 | 185.00 | 0.00 | 0.00 |
| Cellular Phone | 96.45 | 0.00 | 59.98 | 36.47 |
| Facsimile Charge | 24.00 | 0.00 | 0.00 | 24.00 |
| Gas for Rental Car | 16.30 | 0.00 | 0.00 | 16.30 |
| Copies (Notarized) | 5.00 | 0.00 | 0.00 | 5.00 |
| Unknown | 11.00 | 0.00 | 11.00 | 0.00 |
| TOTAL: | $ 1,722.40 | $ 185.00 | $ 1,082.65 | $ 454.75 |

## VII. CONCLUSION.

This Court will award interim fee compensation to Smith Barney in the sum of $298,343.25 and will deny $501,656.75 of the $800,000.00 interim fee request. Reimbursement of expenses will be allowed in

**41.** A proper compensable entry for meal reimbursement should read as follows, for example:

May 1, 1989 Lunch at the Hyatt for attorney Doe and attorney Smith in preparation for afternoon hearing on cash collateral on May 1, 1991 $25.40

**42.** Mr. Benninger's 08/06/91 request to be compensated for a $41.00 meal at Madeline's restaurant in Chicago, Mr. Nora's 09/05/91 request to be compensated for a $222.00 dinner at Strings in Denver, and Mr. Benninger's 09/21/91 and 09/30/91 request to be compensated for an $81.40 meal and a $52.00 meal, respectively, at unknown restaurants in Denver are examples of such extravagance.

the amount of $11,058.23 and denied in the amount of $44,837.83.

Accordingly, it is

ORDERED that the First Quarterly Application of Smith Barney, Harris Upham & Co., Inc. for Interim Allowance of Compensation and Reimbursement of Expenses is ALLOWED, IN PART, to the extent of $298,343.25 in fees and $11,058.23 in expenses, and DENIED, IN PART, to the extent of $501,656.75 in fees and $44,837.83 in expenses; and it is

FURTHER ORDERED that all amounts awarded hereby are subject to final review, adjustment, and possible recapture following a final hearing on compensation and reimbursement; and it is

FURTHER ORDERED that the Debtor shall, henceforth, withhold fifty percent (50%) of all future monthly fees earned by Smith Barney, not twenty-five percent (25%) as heretofore the amount withheld.